UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| WILLIAM THOMPSON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 2:13-cv-00141-JDL |
| | ) |
| THE WEBBER HOSPITAL | ) |
| ASSOCIATION, d/b/a SOUTHERN | ) |
| MAINE MEDICAL CENTER, | ) |
| | ) |
| Defendant. | ) |

**ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff William Thompson ("Thompson") brings this suit against The Webber Hospital Association d/b/a Southern Maine Medical Center ("SMMC"), alleging racial discrimination in violation of both federal and state law. His three-count Complaint alleges that he suffered racial discrimination, a hostile work environment, and unlawful disparate treatment in violation of 42 U.S.C. § 1981, 42 U.S.C. § 2000e, and 5 M.R.S.A. § 4572(1)(A). For the reasons set forth below, I GRANT SMMC's Motion for Summary Judgment.

**I. BACKGROUND**

Thompson was employed as a full-time respiratory therapist at SMMC in Biddeford, Maine between 2007 and 2011. SMMC is owned and operated by the defendant, The Webber Hospital Association. Thompson was terminated from his position in June 2011 following a series of incidents for which he was counseled or otherwise disciplined by his supervisor. Thompson, an African-American man,

1

contends that he was terminated from employment on the basis of racial discrimination in response to his initiation of a romantic relationship with a fellow hospital employee (hereinafter referred to as "JC") who is a Caucasian woman. He seeks relief based under both the disparate treatment and hostile work environment frameworks.

## II. SUMMARY JUDGMENT STANDARD

### A. Federal Rule of Civil Procedure 56

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Ahmed v. Johnson*, 752 F.3d 490, 495 (1st Cir. 2014). "A dispute is genuine if 'the evidence about the fact is such that a reasonable jury could resolve the point in favor of the non-moving party.'" *Johnson v. University of Puerto Rico*, 714 F.3d 48, 52 (1st Cir. 2013) (*quoting Thompson v. Coca-Cola Co.*, 522 F.3d 168, 175 (1st Cir. 2008)). "A fact is material if it has the potential of determining the outcome of the litigation." *Id.* (*quoting Maymi v. P.R. Ports Auth.*, 515 F.3d 20, 25 (1st Cir. 2008)).

The party moving for summary judgment must demonstrate an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). In determining whether this burden is met, the court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor. *Johnson*, 714 F.3d at 52. Once the moving party has made a preliminary showing that no genuine issue of material

fact exists, the nonmovant must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue." *Brooks v. AIG SunAmerica Life Assur. Co.*, 480 F.3d 579, 586 (1st Cir. 2007) (*citing Clifford v. Barnhart,* 449 F.3d 276, 280 (1st Cir. 2006)); Fed. R. Civ. P. 56(c). "As to any essential factual element of its claim on which the nonmovant would bear the burden of proof at trial, its failure to come forward with sufficient evidence to generate a trialworthy issue warrants summary judgment to the moving party." *In re Spigel*, 260 F.3d 27, 31 (1st Cir. 2001) (citation and internal punctuation omitted).

**B.     Local Rule 56**

The evidence that the court may consider in deciding whether genuine issues of material fact exist for purposes of summary judgment is circumscribed by the local rules of this district. *See* Loc. R. 56. The moving party must first file a statement of material facts that it claims are not in dispute. *See* Loc. R. 56(b). Each fact must be set forth in a numbered paragraph and supported by a specific record citation. *See id.* The nonmoving party must then submit a responsive "separate, short, and concise" statement of material facts in which it must "admit, deny or qualify the facts by reference to each numbered paragraph of the moving party's statement of material facts[.]" Loc. R. 56(c). The nonmovant likewise must support each denial or qualification with an appropriate record citation. *See id.* The nonmoving party may also submit its own additional statement of material facts that it contends are not in dispute, each supported by a specific record citation. *See id.* The movant then must respond to the nonmoving party's statement of

3

additional facts, if any, by way of a reply statement of material facts in which it must "admit, deny or qualify such additional facts by reference to the numbered paragraphs" of the nonmovant's statement. *See* Loc. R. 56(d). Again, each denial or qualification must be supported by an appropriate record citation. *See id.*

Local Rule 56 directs that "[f]acts contained in a supporting or opposing statement of material facts, if supported by record citations as required by this rule, shall be deemed admitted unless properly controverted." Loc. R. 56(f). In addition, "[t]he court may disregard any statement of fact not supported by a specific citation to record material properly considered on summary judgment" and has "no independent duty to search or consider any part of the record not specifically referenced in the parties' separate statement of fact." *Id.*; *see also, e.g., Borges, ex rel. S.M.B.W. v. Serrano-Isern*, 605 F.3d 1, 5 (1st Cir. 2010); Fed. R. Civ. P. 56(e)(2) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion[.]").

### III. ANALYSIS

#### A. DISPARATE TREATMENT

SMMC challenges Thompson's ability to make out a prima facie case of disparate treatment discrimination. A prima facie case for discrimination based on disparate treatment presents a four-part test:

> (1) the plaintiff must be a member of a protected class; (2) [he] must be qualified for [his] job; (3) [he] must suffer an adverse employment action at the hands of [his] employer; and (4) there must be some evidence of a causal connection between [his] membership in a

4

> protected class and the adverse employment action, e.g., in the case of a firing, that the position was filled by someone with similar qualifications.

*Bhatti v. Trustees of Boston University,* 659 F.3d 64, 70 (1st Cir. 2011); *see also Cham v. Station Operators, Inc.,* 685 F.3d 87, 93 (1st Cir. 2011). Only a "relatively low threshold showing [is] necessary to establish a *prima facie* case." *Che v. Mass. Bay Transp. Auth.*, 342 F.3d 31, 39 (1st Cir. 2003).

1. **Thompson's Prima Facie Case**

At the outset of its argument concerning Thompson's *prima facie* case of disparate treatment, SMMC contends that his claim is not really a race discrimination claim after all, but is really a claim for "associational race discrimination." ECF No. 29 at 10-11. Yet SMMC cites no authority to support this point. *Id.* at 11. SMMC claims that Thompson cannot bring a claim for associational discrimination because such claims are "not available in this context;" the gist of SMMC's argument being that Thompson, an African-American man and a member of a protected class, cannot sue for associational discrimination because such claims are available exclusively to plaintiffs who are not protected minorities but who suffer discriminatory animus for associating with a member of a protected class. *Id.* (*citing Perez v. Greater New Bedford Vocational Technical School District*, 2013 WL 6058054 (D. Mass. Nov. 13, 2013)).

I do not agree that Thompson's claim is properly construed as one for "associational race discrimination." To follow SMMC's logic would be to foreclose to all protected groups the ability to bring a Title VII claim in situations where the

5

alleged discrimination is based upon an interracial relationship, while reserving those claims exclusively to non-protected groups.  This would go against the purpose of Title VII, and is unsupported by legal authority.  In fact, the case law from other circuits and districts demonstrates that in Title VII discrimination cases featuring both African-American and Caucasian plaintiffs, the African-American plaintiffs brought claims of race discrimination and the Caucasian plaintiffs brought claims of associational race discrimination.  *See Arnold v. City of Columbus*, 515 Fed. Appx. 524 (6th Cir. 2013) (eight African-American plaintiffs filed suit under Title VII alleging race discrimination and retaliation, along with two Caucasian plaintiffs who filed suit alleging associational discrimination and retaliation); *Booker v. Dee Sign Co.*, 2008 WL 839786 (S.D. Ohio 2008) (African-American husband and Caucasian wife sued employer, alleged claims of race discrimination as to the husband and associational discrimination as to the wife); *Black Grievance Committee v. Philadelphia Elec. Co.*, 1984 WL 1506 (E.D. Philadelphia 1984) (twelve construction workers brought Title VII claim alleging a pattern and practice of Title VII discrimination by employer – nine African-American workers alleged race discrimination and three white workers alleged associational race discrimination).

The summary judgment record demonstrates that Thompson has satisfied the threshold of evidence required for a prima facie case.  There is no dispute that Thompson is African-American, and that African-Americans constitute a protected

class for purposes of Title VII and § 1981 claims. He therefore has satisfied the first element of a *prima facie* case of racial discrimination.

Second, Thompson has presented proof that he was qualified for the job because he held the licensing required for the position and had received generally positive job evaluations throughout his employment.

Third and fourth, having been fired from his job, there is little doubt that Thompson suffered an adverse employment action, and SMMC does not dispute that it sought to replace Thompson with someone with roughly equal qualifications.

Because I find that Thompson has made out a prima facie case, discrimination may be inferred and the burden of production – but not persuasion – shifts to SMMC to produce evidence that the decision to terminate Thompson was taken for a legitimate, non-discriminatory reason. *Lockridge v. Univ. of Me. Sys.* 597 F.3d 464, 470 (1st Cir. 2010); *see also Thompson v. Coca-Cola Co.*, 522 F.3d 168, 176 (1st Cir. 2008).

### 2. SMMC's Legitimate, Non-discriminatory Reason for Terminating Thompson's Employment

Thompson responded to many of SMMC's statement of material facts by indicating that he "does not concede the veracity of the statements," but did not otherwise support his denials or qualifications with a citation to an appropriate record citation. Therefore, those facts are deemed admitted. As previously stated, Local Rule 56(d) provides that unless a fact is admitted, the non-movant's reply statement of material facts must support each denial or qualification with a record

citation. Facts that are not properly controverted are deemed admitted. *See* D. Me. Local R. 56(f).

The summary judgment record, viewed in the light most favorable to Thompson as the non-moving party, reveals the following: SMMC asserts that Thompson was terminated in June 2011 based on his "ongoing performance and competency issues, along with the information he had provided about his documentation practices." DSMF ¶ 71, ECF No. 30. Thompson denies this, claiming his termination was racially motivated. Pl.'s Resp. to DSMF ¶ 71, ECF No. 33. SMMC cites the following occurrences between 2009 and 2011 as the basis for its decision to end Thompson's employment:

- May 5, 2009: Thompson received a written warning in May 2009 concerning the level of attention he had paid to a patient's condition. DSMF ¶¶ 6, 7.

- May 13, 2009: Thompson received a warning regarding the manner in which he weaned a ventilator patient's oxygen level and his failure to respond to a subsequent page. This resulted in Thompson receiving a six-month probation. DSMF ¶¶ 8-11, ECF No. 26-7 at 1.

- August 13, 2009: Thompson received a written warning based on a call he made to a doctor regarding the sedation of a patient because a nurse had already ordered the medications she deemed appropriate. Thompson was placed on another three-month probation. DSMF ¶¶ 13-15.

- <u>November 2, 2010</u>: Thompson received a written warning for violating the Hospital's "Unauthorized Visitor" policy by entering the hospital while not working and using his security badge to enter the WIS unit. DSMF ¶¶ 35, 36.

- <u>February 1, 2011</u>: A registered nurse reported to Darren Rainey, Thompson's supervisor, that Thompson was unable to assess a distressed newborn infant because he claimed he did not know enough about the baby, although the nurse had called for a respiratory assessment only. DSMF ¶ 47. Thompson disputes this characterization of his exchange with the nurse, asserting that the nurse told him that she "just wanted 'another set of eyes' to look at the newborn" and was looking for support from him as to whether a physician should be called, thus denying the implication that he refused to perform a requested assessment. PASMF ¶ 28, ECF No. 33. There was no warning or other formal discipline initiated as a result of this incident.

- <u>May 1, 2011</u>: A respiratory therapist informed Rainey that Thompson could not be located during a recent shift and failed to respond to calls or his pager. This had been a persistent issue with Thompson and had been addressed previously.[1] DSMF ¶ 48.

---

[1] Thompson explained to Rainey that he was "using the printer in the [Post Anesthesia Care Unit]" and was surprised that this issue had been brought up again. PASMF ¶ 29, ECF No. 33. He did not, therefore, dispute SMMC's assertions that he could not be reached on his pager and that this had been a persistent problem.

9

- May 9, 2011: Rainey sent Thompson an email related to a complaint from a non-supervisory nurse regarding an interaction she had with Thompson in which he asked extensive questions, and failed to assess the patient and communicate with the nurse. DSMF ¶ 49. Thompson denies this, stating that the referenced email does not report that he "failed to assess" the patient but that he "did the treatment." Pl. Resp. to DSMF ¶ 49. Rainey met with Thompson following this incident to work on his communication skills, but no warning or other formal discipline was initiated. DSMF ¶ 50.

The events that immediately preceded Thompson's termination occurred on June 7 and 8, 2011. At the end of Thompson's night shift on June 7, Rainey had a conversation with Thompson, at which supervisor Mike Pelletier ("Pelletier") was also present. DSMF ¶ 57. During the conversation, "Thompson stated that when he is busy he sometimes documents respiratory listening assessments [of patients] that he had not performed." DSMF ¶ 58. Rainey was shocked by Thompson's statement because falsely documenting respiratory assessments that have not been performed places patients' health at risk, does not meet the minimum standard of care required from a respiratory therapist, violates SMMC policy, and places SMMC at risk of liability. DSMF ¶ 59. Caucasian employees of SMMC had been disciplined for violating the Documentation Policy in 2010 and 2011, and a Caucasian employee was terminated in March 2011 on this basis. DSMF ¶¶ 63, 64.

10

Rainey and Pelletier met with Thompson again on June 8, 2011, along with Susan LaTorre ("LaTorre") of the Human Resources Department. Thompson was told that he was being placed on administrative leave pending further investigation. DSMF ¶ 65. Thompson did not deny that he documented patient assessments that he had not performed, but claimed that he may have misunderstood what Rainey was saying the previous day or thought that he was joking. DSMF ¶ 66. Thompson maintains that he believed at the June 8 meeting they (presumably, Thompson and Rainey) "were joking the day before and he does perform every assessment to the best of his ability." Pl. Resp. to DSMF ¶ 66. He also stated, and Rainey agreed, that it is often difficult to perform a good assessment on a sleeping patient. *See id.*[2] In short, on June 8 Thompson did not dispute that he had told Rainey and Pelletier on June 7 that when he was busy he had documented respiratory listening assessments of patients that he had not performed.

Following the June 8 meeting, SMMC conducted an investigation, including "a review of Thompson's numerous prior warnings, counselings, and his 2010 evaluation." DSMF ¶¶ 67, 68. Thompson asserts that he met or exceeded all or nearly all expectations in his annual performance evaluations. PASMF ¶ 7. Thompson's employment was terminated on June 29, 2011. DSMF ¶ 70.

---

[2] Thompson admitted DSMF ¶¶ 13, 35. Pl. Resp. to DSMF, ECF No. 33 at 2, 4. As to the remaining statements, Thompson either denied or qualified the remaining statements of material fact, primarily by indicating that he "does not concede the veracity of the statements therein." *See*, inter alia, *id.* at ¶ 27. He did not cite to any record citations in support of his denial or qualification, except with respect to the August 2009 incident and the June 2011 incident. He did, however, submit his own additional statement of fact regarding the August 2009 incident and the June 8, 2011, meeting.

11

The foregoing largely undisputed facts establish that SMMC has met its burden of demonstrating a legitimate, non-discriminatory reason for Thompson's discharge. Accordingly, the burden shifts back to Thompson to show, by a preponderance of the evidence, that SMMC's justification for his termination was a pretext for its discriminatory purpose. *See Lockridge*, 597 F.3d at 470.

### 3. Thompson's Evidence of Pretext

Pretext may be demonstrated by showing "weaknesses, implausabilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons such that a fact-finder could infer that the employer did not act for the asserted non-discriminatory reasons." *Santiago-Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 56 (1st Cir. 2000) (quotation omitted). The court looks to whether the "employer's proffered justification for its adverse employment action was such that a trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose." *Ronda-Perez v. Banco Bilbao Vizcaya Argentaria-Puerto Rico*, 404 F.3d 42, 44 (1st Cir. 2005) (quotation omitted).

Thompson's claim of pretext rests on two pillars. First, he claims that he fell into disfavor at the hospital after he became romantically involved with JC, and that their interracial relationship unsettled their co-workers and supervisors, resulting in the discrimination. Second, he contends that there are disputed issues of material fact as to the various job performance problems cited by SMMC as justification for his termination.

### a. Thompson's Relationship with JC

In December 2009, Thompson began dating JC, who worked as a nurse on the pediatric floor at SMMC until August 25, 2010, when SMMC terminated her employment for purported misconduct. PSAMF at ¶ 8. Thompson refers to several incidents to support his claim that his co-workers at SMMC discriminated against him on the basis of race in reaction to his and JC's interracial relationship.

Thompson first asserts that he noticed "more intense discrimination" when the relationship began and that Rainey told him that the relationship was "trouble." PSAMF at ¶ 9. However, at his deposition Thompson testified that the alleged "trouble" comment could have been related to "anything," Def.'s Reply to PSAMF ¶ 9, ECF No. 36, and Thompson did not identify any specific incidents supporting his claim of "discrimination" or "more intense discrimination." *Id*.

Thompson also asserts that JC experienced negative feedback from her supervisors and co-workers regarding her relationship with Thompson. PSAMF at ¶ 10. However, as SMMC indicates, Thompson failed to generate a dispute as to the fact that the "negative feedback" JC received "was related to JC frequently texting and making personal calls, disappearing off the unit, failing to perform patient duties, and making her co-workers uncomfortable" by sharing with them details about her relationship with Thompson. Def.'s Reply to PSAMF ¶ 10.

The closest Thompson comes to proving that his supervisor's and co-workers' concerns regarding his relationship with JC was connected to race are statements

contained in two memoranda.[3] The first memorandum was prepared by a supervisor after meeting with one of JC's co-workers on March 22, 2010, regarding the co-worker's perception that JC's and Thompson's relationship was affecting JC's work performance. The memorandum cites several concerns, including that "[JC] has said that although he leaves it in his vehicle [Thompson] carries a gun because he grew UP 'in the hood.'" ECF No. 34-11. As is apparent, the comment about Thompson carrying a gun and growing up "in the hood" is attributed to JC, not the employee reporting it to the supervisor who prepared the memorandum.

The second memorandum was prepared in connection with a March 25, 2010 meeting of the department where JC worked. It reflects, among other things, that staff members were concerned because: (1) "they [were] watching a 'train wreck' about to happen to a co-worker [that they] cared about"; (2) in one instance, JC and Thompson were speaking to each other in a room while a mother was holding a newborn; (3) there were rumors that Thompson had a weapon; and (4) staff claimed that these circumstances were "frightening to them [and] created a hostile work environment because they did not know what these people were capable of and felt JC is unpredictable." ECF No. 34-13. The first and second comments are consistent with the overall issue addressed in the memorandum that JC and Thompson's workplace behavior as a couple was compromising their professionalism and distracting the staff. The comments were neutral as to Thompson's race. The third

---

[3] Thompson also asserts that in March 2010 JC was told "by her supervisor and co-workers . . . that they were 'disappointed' that she was dating Plaintiff," PSAMF at ¶ 11, and that JC told him that her employment was in jeopardy due to her relationship with him. *Id.* I disregard these statements as hearsay statements that are not supported by references to admissible evidence.

and fourth comments relate to JC's expression of concern to a co-worker regarding Thompson keeping a gun in his truck at work. The reference to "these people," relates to JC "[t]alking about a weapon and she feels threatened by [Thompson's] ex-girlfriend." *Id.* Thus, the memorandum's reference to "these people" is to Thompson and his ex-girlfriend, and is not a reference to Thompson's race or a racial group.

Thompson also cites a notation made by SMMC's Director of Human Resources Lorraine Bouchard ("Bouchard") in her written record regarding the termination of JC's employment in August 2010, which reads: "Waiting for info on Will Thompson." ECF No. 34-14. Standing alone, this notation imports nothing, other than that Bouchard was waiting to receive information regarding Thompson. Thompson also cites to evidence that JC applied for unemployment benefits following her termination for "misconduct," and received unemployment benefits after a hearing officer found that she was not insubordinate. JC's entitlement to unemployment benefits is, however, immaterial as to SMMC's treatment of Thompson.

The evidence cited by Thompson regarding SMMC's response to his workplace relationship with JC does not support his contention that SMMC's stated reason for his termination was pretextual.

### b. Thompson's Job Performance Issues

To the extent that Thompson responds to the various job performance problems cited by SMMC by offering his explanation or justification for his conduct,

15

he does not put into dispute SMMC's corresponding position regarding each incident. "Mere questions regarding the employer's business judgment are insufficient to raise a triable issue as to pretext." *Pearson v. Massachusetts Bay Transp. Auth.*, 723 F.3d 36, 41 (1st Cir. 2013) (quotation omitted). Thompson's disagreement, for example, with a nurse's characterization of his conduct on May 4, 2011, does not create a genuine dispute of material fact as to Rainey's receipt of the nurse's report and the action he took in response. *See Wallace v. O.C. Tanner Recognition Co.*, 299 F.3d 96, 102 (1st Cir. 2002) (summary judgment is appropriate where there is no genuine dispute about the honesty of an employer's belief that the employee was neglecting his duties).

Thompson also cites to his annual performance appraisals for 2008 through 2010, as evidence of pretext, noting that he met or exceeded the majority of his performance goals for the year. He contends that the performance evaluations "demonstrate 'weaknesses or implausibilities' in any claim by [SMMC] that [he] was not meeting expectations or not demonstrating competence in his job at any time prior to March 6 2011."[4] Pl.'s Resp. at 19, ECF No. 32. SMMC responds that the

---

[4] Thompson's Additional Statements of Material Fact, and SMMC's Response are as follows:

7. Plaintiff's annual performance appraisals indicate that he met or exceeded the majority of his performance goals year after year.

RESPONSE: Denied. In Plaintiff's last performance evaluation – for calendar year 2010 – he received a score of 650 points out of 1000, which was the lowest score out of 9 [respiratory therapists]. (DSMF ¶¶ 39-40; JSR Ex. 13.) In his 2009 evaluation, Plaintiff received 600 points out of 1000. (JSR Ex. 12.) In his 2010 evaluation, Plaintiff received three stars in the majority of evaluation categories, which represents the second to lowest available rating. (JSR Ex. 13.) Plaintiff's 2010 evaluation included several items of critical feedback in the narrative sections, including: "Feedback from multiple disciplines has identified they do not always feel supported or have confidence in Will"; "he needs to give all of his attention to the disciplines seeking his assistance and guidance . . . [and] rely less on mentors"; "Will had a few experiences where he

16

performance evaluations did not address the events that occurred in 2011 and, as to the prior years, the evaluations were not in conflict with the disciplinary events that SMMC relies upon to establish its legitimate, non-discriminatory basis for Thompson's termination. I agree with SMMC's characterization of this evidence for the following three reasons.

First, the performance evaluations establish that Thompson met or exceeded *the majority* of his performance goals, meaning that he failed to meet or exceed at least some of his annual performance goals. Second, the 2010 performance evaluation contains comments by Rainey, Thompson's supervisor, that are consistent with the problems that occurred in 2010 (for example, "Feedback from multiple disciplines has identified they do not always feel supported or have confidence in Will"). ECF No. 26-13 at 5. Finally, there is no performance evaluation for 2011, the year in which Thompson's most serious transgressions occurred. That the performance evaluations from 2008 to 2010 reflect that Thompson performed most aspects of his responsibilities in a commendable manner does not call into question the reliability of the largely undisputed evidence related to those aspects of his performance which were deficient. *See Benoit v. Technical Mfg. Corp.*, 331 F.3d 166, 174 (1st Cir. 2003) (concluding that an employee's improved performance review was insufficient to create a trialworthy issue as to

---

did not utilize active listening skills due to the critical situation at hand. This is one of the most crucial times to utilize excellent communication skills . . . ." (JSR Ex. 13.) Furthermore, Plaintiff's last performance evaluation predated the investigation and events leading up to his termination. (JSR Ex. 13; LaTorre Aff. ¶ 6; Ex. 3 thereto.)

Def.'s Reply to PSAMF ¶ 7, ECF No. 36.

pretext, especially given the employer's reliance on other reasons for firing the employee); *Byrd v. Ronayne*, 61 F.3d 1026, 1032 (1st Cir. 1995) (concluding that an employee's favorable performance review does not generate a trialworthy dispute as to pretext where a subsequent "mixed" performance review presaged the declining trajectory of the employee's performance).

Thompson's performance evaluations are not in serious conflict with his disciplinary history and do not demonstrate that SMMC's stated rationale for ending his employment is weak or implausible. The pretext evidence that Thompson offers falls far short of generating a genuine dispute of fact as to SMMC's position that it terminated Thompson because of "ongoing performance and competency issues, along with Documentation Policy violations." ECF No. 29. Accordingly, I find that summary judgment is warranted on Plaintiff's claim of disparate treatment race discrimination.

## B. HOSTILE WORK ENVIRONMENT

Although Thompson's complaint includes an allegation of a hostile work environment on the basis of race, his response to SMMC's statement of material facts and his additional statement of material facts do not contain evidence that could establish a hostile work environment at SMMC. As indicated earlier, Thompson relies upon certain statements directed at either him or JC that were supported by citations to admissible evidence. However, none of those statements were racially-tinged or suggest a workplace "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the

18

conditions of the victim's employment and create an abusive working environment." *Wilson v. Moulison N. Corp.*, 639 F.3d 1, 6-7 (1st Cir. 2011); *see also Prescott v. Higgins*, 538 F.3d 32, 42-43 (1st Cir. 2008). Because Thompson has failed to generate a factual dispute that could give rise to liability based on a hostile work environment, I conclude that summary judgment is properly awarded to SMMC as to that theory of liability as well.

## IV. CONCLUSION

SMMC's motion for summary judgment is GRANTED as to all counts of the complaint.

**SO ORDERED.**

**DATED THIS 8TH DAY OF September, 2014.**

                                                **/s/ Jon D. Levy**
                                                **United States District Judge**